**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3850-18T3

MERCEDES-BENZ USA, LLC,

    Plaintiff-Appellant,

v.

NIPPON YUSEN KABUSHIKI
KAISHA, NYK LINE
(NORTH AMERICA) INC.,
NYK BULKSHIP (USA) INC.,
MITSUI O.S.K. LINES, LTD.,
MITSUI O.S.K. BULK SHIPPING
(USA) LLC, KAWASAKI KISEN
KAISHA, LTD., and "K" LINE
AMERICA, INC.,

    Defendants,

and

WALLENIUS WILHELMSEN
LOGISTICS AS a/k/a
WALLENIUS WILHELMSEN
OCEAN AS, and WALLENIUS
WILHELMSEN LOGISTICS
AMERICAS, LLC

    Defendants-Respondents.

_____

Argued telephonically April 22, 2020 –
Decided August 10, 2020

Before Judges Koblitz, Gooden Brown and Mawla.

On appeal from the Superior Court of New Jersey,
Law Division, Bergen County, Docket No. L-6325-18.

Ethan Glass (Quinn Emanuel Urquhart & Sullivan,
LLP) of the District of Columbia bar, admitted pro hac
vice, argued the cause for appellant (Archer &
Greiner, PC, and Ethan Glass (Quinn Emanuel
Urquhart & Sullivan, LLP) of the District of Columbia
bar, admitted pro hac vice, attorneys; Thomas J.
Herten, Nicole G. McDonough, and Ethan Glass, on
the brief).

Roberto A. Rivera-Soto argued the cause for
respondents Wallenius Wilhelmsen Logistics AS a/k/a
Wallenius Wilhelmsen Ocean AS, and Wallenius
Wilhelmsen Logistics Americas, LLC (Ballard Spahr
LLP, attorneys; Roberto A. Rivera-Soto, of counsel
and on the brief).

PER CURIAM

We consider a question of federal preemption of state antitrust, tort and

contract claims, by the federal Shipping Act of 1984, 46 U.S.C. §§ 40101 to

41309. Plaintiff Mercedes-Benz USA filed suit against defendants Wallenius

Wilhelmsen Logistics AS a/k/a Wallenius Wilhelmsen Ocean AS, and

Wallenius Wilhelmsen Logistics Americas, LLC (WWL) and others[1] in state court alleging violations of the New Jersey Antitrust Act, N.J.S.A. 56:9-1 to -19, tortious interference, breach of contract and breach of the implied covenant of good faith and fair dealing. Before this suit was filed, a federal court dismissed a class action seeking relief under the Clayton Act, 15 U.S.C. § 15, for violations of the Sherman Act, 15 U.S.C. § 1, as well as state antitrust, consumer protection and unjust enrichment claims, and the Third Circuit later affirmed. In re Vehicle Carrier Servs. Antitrust Litig., 846 F.3d 71, 78 (3d. Cir. 2017). In its March 29, 2019 order, the trial court also dismissed plaintiff's claims with prejudice, agreeing with the Third Circuit's reasoning that the Shipping Act preempted all state claims. We now affirm.

I. Factual Background.

Beginning in 1997, plaintiff purchased roll-on, roll-off (RO-RO) services from defendants, non-U.S.-flagged vessels within the jurisdiction of the United States, to ship new Mercedes-Benz automobiles to and from the United States. In September 2012, plaintiff became aware that defendants were engaged in an illegal

---

[1] Nippon Yusen Kabushiki Kaisha, NYK Line (North America) Inc. and NYK Bulkship (USA) Inc. have resolved their issues with plaintiff and are not participating in this appeal. Defendants Mitsui O.S.K. Lines, Ltd., Mitsui O.S.K. Bulk Shipping (USA) LLC, Kawasaki Kisen Kaisha, Ltd., and "K" Line America, Inc. were also dismissed from this appeal.

price-fixing agreement after media outlets reported a raid of defendants' offices by antitrust authorities from the United States, European Union and Japan in connection with ongoing criminal investigations. As they admitted later, defendants were engaged in this price-fixing agreement during their years servicing plaintiff's contract. WWL eventually admitted to its illegal conduct, entering a guilty plea in federal court in 2016 and agreeing to pay 98.9 million dollars in fines. The same year WWL also agreed to pay 1.5 million dollars to the Federal Maritime Commission (FMC).

Direct purchasers of RO-RO shipping services filed a class action suit against defendants in July 2013, asserting federal antitrust claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as state antitrust claims and claims for consumer fraud and unjust enrichment. Vehicle Carrier, 846 F.3d at 77-78. The complaint was amended following the consolidation of the direct purchasers' class with the indirect purchasers' class. The amended complaint defined the putative class as "[a]ll persons and entities that purchased [v]ehicle [c]arrier [s]ervices for shipments to or from the United States directly from any of the [d]efendants or any current or former predecessor, subsidiary or affiliate of each, at any time during the period from January 1, 2000 to December 31, 2012."

In August 2015, the District Court dismissed the direct purchasers' amended complaint. The Third Circuit affirmed the dismissal, finding the Shipping Act preempted both federal and state court action. Ibid. The Supreme Court denied certiorari. Alban v. Nippon Yusen Kabushiki Kaisha, et al., ___ U.S. ___, 138 S. Ct. 114 (2017).

On August 30, 2018, plaintiff filed a complaint against defendants in the New Jersey Superior Court, alleging violations of the New Jersey Antitrust Act, breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference. Defendants removed the case to the District Court, which in turn remanded it to the Superior Court.

## II. Standard of Review.

As with questions of law in general, Mejia v. Quest Diagnostics, Inc., 241 N.J. 360, 370-71 (2020), we review issues of federal preemption de novo. In re Reglan Litig., 226 N.J. 315, 327 (2016). "The doctrine of federal preemption finds its source in the Supremacy Clause of the United States Constitution." Id. at 328. "The party claiming preemption bears the burden of supporting that claim by 'clear and manifest evidence.'" Franklin Tower One, L.L.C. v. N.M., 157 N.J. 602, 615 (1999) (quoting Pa. Med. Soc'y v. Marconis, 942 F.2d 842, 853 (3d. Cir. 1991)).

"[Preemption] may be either express or implied." In re Reglan Litig., 226 N.J. at 328 (quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992)). Preemption may be implied "where the federal legislation is so comprehensive that it creates the inference that Congress intended to leave no room for state regulation in the area." Franklin, 157 N.J. at 615. Alternatively, conflict preemption is applied "where a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Id. at 616 (quoting Mich. Canners & Freezers Ass'n v. Agric. Mktg. & Bargaining Bd., 467 U.S. 461, 470 (1984)).

### III. The Shipping Act of 1984.

The Shipping Act of 1984 was intended to:

> (1) establish a nondiscriminatory regulatory process for the common carriage of goods by water in the foreign commerce of the United States with a minimum of government intervention and regulatory costs;

> (2) provide an efficient and economic transportation system in the ocean commerce of the United States that is, insofar as possible, in harmony with, and responsive to, international shipping practices;

> (3) encourage the development of an economically sound and efficient liner fleet of vessels of the United States capable of meeting national security needs; and

> (4) promote the growth and development of United States exports through competitive and efficient ocean

A-3850-18T3

transportation and by placing a greater reliance on the marketplace.

[46 U.S.C. § 40101.]

Section 40302 of the Shipping Act requires that "every agreement referred to in section 40301(a) . . . of this title shall be filed with the [FMC]." 46 U.S.C. § 40302.

Ocean common carrier agreements that must be filed with the FMC are those that:

(1) discuss, fix, or regulate transportation rates, including through rates, cargo space accommodations, and other conditions of service;

(2) pool or apportion traffic, revenues, earnings, or losses;

(3) allot ports or regulate the number and character of voyages between ports;

(4) regulate the volume or character of cargo or passenger traffic to be carried;

(5) engage in an exclusive, preferential, or cooperative working arrangement between themselves or with a marine terminal operator;

(6) control, regulate, or prevent competition in international ocean transportation; or

(7) discuss and agree on any matter related to a service contract.

A-3850-18T3

[46 U.S.C. § 40301(a).]

An agreement between or among ocean common carriers may not "prohibit or restrict a member of the agreement from engaging in negotiations for a service contract with a shipper"; "require a member of the agreement to disclose a negotiation on a service contract, or the terms of a service contract, other than those terms required to be published under section 40502(d) of this title"; or "adopt mandatory rules or requirements affecting the right of an agreement member to negotiate and enter into a service contract." 46 U.S.C. § 40303(a)(1).

Once an agreement has been filed with the FMC and becomes effective, the carriers are subject to regulation by the FMC and receive exemption from antitrust laws. 46 U.S.C. § 40307. The Act defines "antitrust laws" as the following federal statutes: the Sherman Act, 15 U.S.C. §§ 1 to 7; the Wilson Tariff Act, 15 U.S.C. §§ 8, 9; the Clayton Act, 15 U.S.C. §§ 12 to 27; the Act of June 19, 1936, 15 U.S.C. §§ 13, 13(a), 13(b) and 21(a); the Federal Trade Commission Act, 15 U.S.C. §§ 41 to 58; and the Antitrust Civil Process Act, 15 U.S.C. §§ 1311 to 1314; as well as "[a]cts supplementary to those [a]cts." 46 U.S.C. § 40102(2).

As to unfiled agreements, the Shipping Act provides:

> A person may not operate under an agreement required to be filed under section 40302 or 40305 of this title if —

(1) the agreement has not become effective under section 40304 of this title or has been rejected, disapproved, or canceled; or

(2) the operation is not in accordance with the terms of the agreement or any modifications to the agreement made by the [FMC].

[46 U.S.C. § 41102(b).]

These unfiled agreements may result in criminal sanctions, Vehicle Carrier, 846 F.3d at 85, but are also immune from antitrust litigation insofar as 46 U.S.C. § 40307(d) states: "A person may not recover damages under section 4 of the Clayton Act (15 U.S.C. [§] 15), or obtain injunctive relief under section 16 of that Act (15 U.S.C. [§] 26), for conduct prohibited by this part [46 U.S.C. §§ 40101 to 41309]." Thus, plaintiff could not sue in federal court for damages due to the unfiled illegal agreement of defendants.

IV. Preemption.

Plaintiff argues that the court improperly relied on the Third Circuit Vehicle Carrier decision. Plaintiff asserts its state "claims do not pose an obstacle to the accomplishment of the purpose of the Act." It bases this conclusion on three points: A) the joint opinion of the FMC and United States Antitrust Division; B) "the simple fact that the Shipping Act and New Jersey law coexist"; and C) the

A-3850-18T3

Shipping Act's textual reference to federal statutes only and the legislative history, which does not mention state antitrust, tort, or contract claims.

## A. Federal Agency Input.

Plaintiff argues that we should afford "substantial deference" to the analysis provided by the FMC and the United States Antitrust Division in their joint amici brief submitted to the Third Circuit in Vehicle Carrier. "The FMC's view, which United States shares, is that damages claims under state antitrust law challenging unfiled price-fixing agreements between carriers would not contravene the purposes of the Shipping Act, negatively affect the FMC's enforcement of the Shipping Act,[2] or otherwise frustrate its administration of that Act." The FMC

---

[2] The Shipping Act authorizes the FMC to both investigate violations of the statute either by complaint or on its own motion and hold proceedings for private enforcement. 46 U.S.C. §§ 41301, 41302(a). In all, according to the Supreme Court, "the similarities between FMC proceedings and civil litigation are overwhelming." Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 759 (2002). Where reparations are appropriate, the FMC may, depending on the violation, award up to double the amount required to compensate for the injury, 46 U.S.C. § 41305(b) to (c), prejudgment interest, 46 C.F.R. § 502.253, and reasonable attorney fees, 46 C.F.R. § 502.254.

The Shipping Act limits an award of "reparations" for an injury caused by a violation of the statute to complaints filed within three years from the date the relevant claim accrues, 46 U.S.C. § 41301(a), and the regulations echo that limitation, 46 C.F.R. § 502.62(a)(4)(iii). Many other plaintiffs filed claims before the FMC from 2015 to 2017, nearly all of which were deemed time barred.

A-3850-18T3

and United States submitted the following statement regarding the indirect purchasers' claims under state antitrust laws:

> State antitrust law has traditionally operated alongside its federal counterpart, see California v. ARC Am. Corp., 490 U.S. 93, 101 n.4 (1989) (noting that "[twenty-one] states had already adopted their own antitrust laws" when the Sherman Act was enacted); 14 Areeda & Hovenkamp, Antitrust Law ¶ 2401(a). Congress is presumed to have been aware of this background when it passed the Shipping Act. Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."). It can be inferred, then, that Congress intended for state law to complement the government's criminal prosecutions and civil penalties imposed on ocean carriers that operate under price-fixing agreements that are not exempted by the Shipping Act.

The Third Circuit in Vehicle Carrier declined to defer to the position of amici, stating:

> Finally, the FMC's and United States' position on conflict preemption is not "persuasive[]." See [Wyeth v. Levine, 555 U.S. 555, 577 (2009)]. We recognize, as they assert, that the Shipping Act and its legislative history are silent regarding state law claims. However, the position that the Shipping Act contemplates state law antitrust enforcement is inconsistent with the conclusion that the Shipping Act bars Clayton Act claims (with which amici agree); it also overlooks the purposes of the Act as set forth in the statute and legislative history as well as the comprehensive scheme for enforcement of Shipping Act violations before the FMC.

11

[846 F.3d at 86 n.17.]

We are undisputedly not bound by the Third Circuit decision. Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 79-80 (1990). At most, the Third Circuit decision constitutes persuasive authority. State v. Diorio, 216 N.J. 598, 615 (2014). But the statute does provide for immunity from federal antitrust laws for agreements filed with the FMC, and immunity from the Clayton Act for unfiled illegal agreements. Its legislative history confirms that an FMC proceeding was meant to be the exclusive federal remedy for those violations. Seawinds Ltd. v. Nedlloyd Lines, B.V., 80 B.R. 181, 184 (N.D. Cal. 1987), aff'd o.b., 846 F.2d 586 (9th Cir. 1988).[3]

We do not owe federal agencies any greater deference than do federal courts, see N.J. Hospice & Palliative Care Org. v. Guhl, 414 N.J. Super. 42, 52-53 (App. Div. 2010) (requiring deference, but only to the same level as federal courts), and the Third Circuit did not defer to the amici. As a general rule, while regulations and other formal agency actions are afforded considerable deference, more informal statutory interpretations, such as reflected in the amici legal brief, are given lesser deference and then only to

---

[3] In Seawinds, the District Court dismissed a complaint entailing both federal antitrust and pendent state common law claims on preemption grounds, although it never explicitly held that the Shipping Act preempted the state claims along with the federal ones. Id. at 182-83, 189-90.

the extent they are persuasive—that is, depending on the "thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade." Nutley Policemen's Benevolent Ass'n Local #33 v. Twp. of Nutley, 419 N.J. Super. 160, 167-68 (App. Div. 2011) (alteration in original) (quoting Big M, Inc. v. Tx. Roadhouse Holding, LLC, 415 N.J. Super. 130, 136 (App. Div. 2010)).

No deference is due to an agency's ultimate legal conclusion, whether formal or informal, with regard to matters of federal preemption. Farina v. Nokia Inc., 625 F.3d 97, 126 (3d Cir. 2010). Neither the FMC nor United States submitted its position to us, nor must we defer to a federal agency, especially when the federal courts have chosen not to do so. That said, we perceive the agencies to be focused primarily on stricter enforcement measures rather than enhancing the Shipping Act's intended aims of reducing complex restrictions imposed on shipping in and out of the United States, including "provid[ing] an efficient and economic transportation system in the ocean commerce of the United States that is, insofar as possible, in harmony with, and responsive to, international shipping practices." 46 U.S.C. § 40101(2).

In their brief amici commented colorfully:

Congress did not intend to protect ocean carriers operating under unfiled and ineffective agreements. To the contrary, it determined that regulation by only the FMC would be insufficient to deter and punish those who chose to collude covertly. The Shipping Act, therefore, contemplates robust enforcement of the antitrust laws against those companies and individuals, like many of the ocean carriers here, who enter into secret agreements, including the imposition of substantial criminal fines against ocean carriers and imprisonment of their culpable executives. . . . Additional antitrust scrutiny of unfiled agreements, in the form of damages claims under state law, is perfectly consistent with this robust enforcement. Under Congress's scheme, ocean carriers that covertly violate the antitrust laws can be thrown into the briny deep. This scheme is not frustrated by the possibility that sharks also swim in those waters.

Defendants have suffered severe economic sanctions. The issue before us is whether additional state litigation is permitted. The Shipping Act's aim of avoiding further restrictions and regulations on ocean transport is not furthered by allowing state litigation in all those states touched by international shipping.

### B. No Direct Conflict Between State Claims and the Shipping Act.

Plaintiff argues that United States Supreme Court precedent "allows federal-state parallel enforcement of the antitrust laws," as does New Jersey law, which permits the state to "impose additional penalties for the same conduct that is prohibited under federal law." Plaintiff cites to California v. ARC America Corp., 490 U.S. 93, 102 (1989), where the Supreme Court found that a state law

permitting indirect purchaser recoveries was "consistent with the broad purpose of the federal antitrust laws: deterring anticompetitive conduct and ensuring the compensation of victims of that conduct."

Plaintiff asserts that the "conspiracy among [d]efendants directly impacted and restricted negotiations involving [p]laintiff's service contracts." Plaintiff cites to In re Reglan Litigation, where our Supreme Court found that federal law did not preempt the plaintiff's state law failure-to-warn claims regarding an allegedly inadequate prescription drug label. 226 N.J. at 343–44. In making this finding, the Court reasoned that the defendants "did not have to violate federal law to comply with state law. . . . [I]t [was] not impossible to comply with both federal and state law." Id. at 336. Plaintiff asserts that the same reasoning applies here because "the obligations imposed by New Jersey law run 'parallel to' and 'promote' federal policies and obligations; they do not work against them." Plaintiff argues that both the Shipping Act and state contract, tort, and antitrust laws prohibit defendants' conduct, and thus, compliance with federal and state law is not impossible.

State litigation is consistent with the federal aims insofar as, if successful, plaintiff would extract additional civil penalties from defendants. No conflict exists between federal and state requirements.

### C. The Text and Legislative History of the Shipping Act.

A-3850-18T3

Plaintiff cites to two provisions of the Shipping Act, 46 U.S.C. § 40307(a) and (d), that "expressly preempt federal, civil antitrust claims," but do not reference state law claims. The Shipping Act does not mention state antitrust statutes nor other state claims.

Plaintiff asserts that Congress' failure to include language in the Shipping Act preempting state claims "confirms that the Act was not intended to preempt state antitrust claims." Plaintiff also cites to the Supreme Court's decision in Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 376 (1958), for the proposition that when one or more items within a class are expressly included in a definition, all that are not enumerated are deemed to be excluded.

Plaintiff argues further that even if we determine that the text of the Shipping Act is ambiguous, the legislative history supports a finding that Congress did not intend for the Act to preempt state antitrust claims. While the legislative history does not specifically mention state antitrust claims, it does "demonstrate Congress's intent to create a comprehensive, predictable federal framework to ensure efficient and nondiscriminatory international shipping practices." Vehicle Carrier, 846 F.3d at 82. The Third Circuit explained:

> Congress sought to limit the application of the antitrust laws to enable U.S.-flag carriers to compete against their foreign counterparts who may not be subject to similar restrictions. See H.R. Rep. No. 98-53(I), at 9, 10

16

[(1983), <u>as reprinted in</u> 1984 U.S.C.C.A.N. 167, 174-75] (noting "[t]he perception . . . that the threat of U.S. antitrust prosecution weighs much more heavily on U.S. operators than their foreign-flag competition" and recognizing a "need to foster a regulatory environment in which U.S.-flag liner operators are not placed at a competitive disadvantage vis-a-vis their foreign-flag competitors"); S. Rep. No. 98-3, at 7 [(1983)] . . . (noting trading partners' "blocking statutes" and stating that "[c]lear antitrust immunity . . . marks a major step in revitalizing our maritime industry because it removes a major handicap created by uneven enforcement"); <u>see also</u> S. Rep. No. 98-3, at 1 . . . (recommending the bill "in order to . . . harmonize U.S. shipping practices with those of our major trading partners, especially by reaffirming antitrust immunity for certain carrier and conference activities"). To allow state antitrust claims to proceed would interfere with this goal.

[<u>Id.</u> at 85.]

Congress was particularly concerned about the "creation of parallel jurisdiction over persons or matters which are subject to the Shipping Act," and stated that "the remedies and sanctions provided in the Shipping Act . . . will be the exclusive remedies and sanctions for violations of the Act." H.R. Rep No. 98-53(I), at 12, 1984 U.S.C.C.A.N. at 177. The legislative history reveals ample evidence of the goals cited by the Third Circuit. As pertinent here, "[p]rivate suits for damages under the antitrust laws w[ould] no longer be permitted when the injury [wa]s the result of conduct prohibited by the Shipping Act," H.R. Conf. Rep.

17

No. 98-600, at 40 (1984), as reprinted in 1984 U.S.C.C.A.N. 283, 296, leaving the "remedies and sanctions provided in the [statute as] the exclusive remedies and sanctions for [its] violation," H.R. Rep. No. 98-53(I), at 12, 1984 U.S.C.C.A.N. at 177. To protect private parties, enhanced remedies would be available before the FMC. Conf. Rep. on S. 47, Shipping Act of 1984, 130 Cong. Rec. 4644, 4645 (1984) (statement of Rep. Rodino).

Yet, notably, while the definition of "antitrust laws," from which the statute conferred immunity, was designed to be "comprehensive in scope," H.R. Rep. No. 98-53(I), at 28, 1984 U.S.C.C.A.N. at 193, it includes only federal enactments, 46 U.S.C. § 40102(2). Moreover, mentions in the legislative history of concepts such as providing for "exclusive remedies" before the FMC or avoiding confusing "parallel jurisdiction" are invariably explained with reference to federal courts or antitrust laws. See, e.g., H.R. Rep. No. 98-53(I), at 12, 1984 U.S.C.C.A.N. at 177 (citing problematic federal court decisions and pointing to federal antitrust laws); see also Conf. Rep. on S. 47, 130 Cong. Rec. at 4649 (statement of Rep. Fish) (mentioning FMC's "virtual exclusive role" in enforcement in connection with antitrust laws); id. at 4652 (statement of Rep. Hughes) (mentioning "exclusive authority" of FMC

18

in connection with antitrust laws). Thus, the legislative history does not plainly support the argument of either party.

The international nature of the Shipping Act, however, lends support to preemption because international relations generally fall within the scope of the federal government rather than the states. The Shipping Act was intended in large part to prevent United States shippers from being hampered competitively in relation to other international shippers by myriad regulations and types of litigation in different fora. While defendants are foreign shippers, it would be unreasonable to allow state litigation only when the defendants were not U.S.-flag shippers. Although case law from the circuit courts is not binding, it may be used persuasively. As did the trial court, we find the Third Circuit's reasoning persuasive.

The Third Circuit found the Shipping Act was intended to protect the United States shipping industry's competitive position. Federal criminal prosecution coupled with the FMC proceedings exacted a significant financial consequence for defendants' illegal activity and a deterrent to repeat the behavior. Plaintiff is precluded from relief in state court.

A-3850-18T3

Plaintiff's other state claims, sounding in tort and contract law, are based on the same behavior as its state antitrust claims, reframed as other causes of action. The Third Circuit found the consumer protection and unjust enrichment claims were also preempted because allowing "them here would allow the States to impose rules in an area Congress has historically regulated: maritime commerce." Vehicle Carrier, 846 F.3d at 85 (citing United States v. Locke, 529 U.S. 89, 108 (2000)). We agree with the Third Circuit's reasoning as applied to the tort claims at issue here.

The Shipping Act states that "the exclusive remedy for a breach of a service contract is an action in an appropriate court." 46 U.S.C. § 40502(f). The FMC and other courts have interpreted this clause to mean that claims that relate to issues peculiar to the Shipping Act should not be decided in court, but rather before the FMC. See, e.g., In re Containership Co. (TCC) A/S, 466 B.R. 219, 227 (Bankr. S.D.N.Y. 2012) (stating that when deciding between "a mere contract dispute and an alleged violation that is 'particular'" to the Act, "courts have deferred to the FMC to address issues that are specifically and expressly addressed in the Shipping Act, such as whether an entity should be considered a 'common carrier' or whether certain shipping practices are illegal and discriminatory and in violation of the

Act"); CargoOne, Inc. v. COSCO Container Lines, Co., F.M.C. No. 99-24, at 14 (Oct. 21, 2000) (noting that "the more appropriate test is whether a complainant's allegations are inherently a breach of contract claim, or whether they also involve elements peculiar to the Shipping Act"). Congress has "put in place a regulator familiar with complex foreign commerce issues confronting ocean common carriers," allowing the FMC to use its special expertise "to make informed decisions about whether conduct violates the Act and warrants punishment." Vehicle Carrier, 846 F.3d at 86. Claims involving issues that are not particular to the Shipping Act and do not require FMC expertise fall outside the jurisdiction of the FMC. See, e.g., LSB Indus., Inc. v. Prudential Lines, Inc, 736 F.2d 10, 12 (2d Cir. 1984) (finding that the issue of "what constitutes a 'full' barge" was outside the FMC's exclusive jurisdiction because it "did not involve reasonableness of rates, interpretation of technical terms, or other matters calling for FMC expertise").

Claims for breach of contract, which the Third Circuit did not address, are distinct in character from both tort and antitrust claims in that the duties they entail are voluntarily undertaken rather than imposed by law. Kossick v. United Fruit Co., 365 U.S. 731, 741 (1961). Moreover, contract enforcement ordinarily falls "within the traditional scope of the state's police powers." Chae v. SLM Corp., 593 F.3d 936, 944 (9th Cir. 2010).

21

Yet the contracts at issue here specifically deal with international maritime commerce, a field traditionally regulated by the federal government, eliminating any presumption against preemption. Vehicle Carrier, 846 F.3d at 84-85. More importantly, although breaches of contract may sometimes escape the preemption applied to other state claims, see, e.g., Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 222 (1995), they do not do so pursuant to a special standard all their own. They simply survive the same standard the others fail—as pertinent here, whether the "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" so as to present an "actual[] conflict[]" with federal law. English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990) (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

For purposes of comparison, Section 301(a) of the Labor Management Relations Act (LMRA), which broadly authorizes lawsuits for violation of a collective bargaining agreement (CBA) to be brought in federal court, 29 U.S.C. § 185(a), preempts both contract and tort claims under state law so long as their resolution "substantially depend[s]" on interpretation of a CBA. Berda v. CBS Inc., 881 F.2d 20, 22-24 (3d Cir. 1989) (quoting Allis–Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985)). The rationale for preemption was that

the uniformity offered by a federal common law governing CBA interpretation would give a measure of certainty to parties to the collective bargaining process, promoting agreement and, consequently, "industrial peace." Id. at 22-23 (citing Teamsters v. Lucas Flour Co., 369 U.S. 95, 103-04 (1962)).

The Employee Retirement Income Security Act of 1974 (ERISA) similarly preempts both state contract and tort actions arising from the improper processing of a claim pursuant to an insured employee benefit plan governed by that legislation. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 43, 57 (1987). The Supreme Court's conclusion in that regard largely turned on interpretation of a set of statutory provisions addressing preemption, id. at 44-45, 57, but was also informed by a congressional intent, evident from the language and structure of the law and its legislative history, that the civil enforcement scheme set forth in the statute was to provide an exclusive remedy for violation, id. at 52-54, 57. The Court elaborated that this scheme

> represent[ed] a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans. The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.

A-3850-18T3

[Id. at 54.]

In contrast, the Supreme Court determined in American Airlines, that while the Airline Deregulation Act of 1978 (ADA), 49 U.S.C. § 41713, otherwise "bar[red] state-imposed regulation of air carriers" with regard to rates, routes, or services, preempting the plaintiffs' consumer fraud claims, the statute nonetheless "allow[ed] room for court enforcement of contract terms set by the parties themselves" through the airline's frequent flier program. 513 U.S. at 222. Again, the Court's conclusion turned in part on the specific language of the exemption provision. Id. at 228-29. But the Court further noted that the ADA had been intended to promote reliance on market forces, and that market efficiency, in turn, "require[d] effective means to enforce private agreements." Id. at 230.

Moreover, other federal statutory provisions and regulations governing the industry "presuppose[d] the vitality of contracts governing transportation by air carriers," and nothing in the ADA suggested either the creation of a "new administrative process for . . . adjudication of [such] private contract disputes," or any intent to "channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law, the range of contract claims relating to airline rates, routes, or services." Id. at 230-32.

24

Notably, the Court explicitly contrasted the ADA with ERISA in the last respect. Id. at 232.

The Shipping Act is more similar to ERISA and the LMRA than to the ADA. Like ERISA and in contrast to the ADA, the Shipping Act does reflect an intent to provide an exclusive remedy for violations of the Act and, indeed, creates an administrative enforcement mechanism for that purpose in the form of a proceeding before the FMC. Vehicle Carrier, 846 F.3d at 86-87. The statute's legislative history, moreover, suggests that this exclusive enforcement mechanism serves to ensure uniformity of interpretation, similarly to the LMRA. Id. at 85-86. While nothing in the text of the Shipping Act or its legislative history explicitly contemplates preemption of anything other than federal antitrust claims, plaintiff offers no relevant distinction between the effect on uniform federal regulation of maritime commerce that would arise from enforcement of a state contract or tort claim on the one hand and enforcement of a state antitrust claim on the other. If one is preempted, all must be.

A review of the complaint confirms that every allegation of breach, whether of an express or implied provision, stems from anticompetitive behavior: a "conspiracy" among defendants to "overcharge" plaintiff for

services. Regulation of international maritime commerce is peculiarly federal. The Shipping Act preempts all of plaintiff's state claims.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3850-18T3